## YELLOW POPLAR LUMBER CO. v. DANIEL.

(Circuit Court of Appeals, Sixth Circuit. May 7, 1901.)

No. 906.

1. CORPORATIONS—CONTRACTS—AVOIDANCE FOR FRAUD OF AGENT.

A contract for the sale of logs to a lumber company is not rendered void for fraud, or voidable at the instance of the company, after it has been fully performed by the seller, so as to preclude him from maintaining a suit in equity to enforce a lien given thereby, by the fact that, after the contract was made, an agreement was made between the seller and the manager of the company, who acted in its behalf in making the purchase, for a division of the profits of the sale, where it appears that such agreement was not contemplated at the time of the sale, but was subsequently exacted by the manager, and acceded to by the seller, under threat of a repudiation of the contract by the company, and no damage is shown to have resulted to the company from the subsequent agreement between the vendor and the agent.

2. INTEREST—KENTUCKY STATUTE.

Under Carroll's Ky. St. c. 72, interest is recoverable on the price of property sold and delivered from the time such delivery is made and the price is payable.

Appeal from the Circuit Court of the United States for the District of Kentucky.

John F. Hager and John N. Baldwin, for appellant.
Thomas N. Ross and Thomas R. Brown, for appellee.

Before LURTON, DAY, and SEVERENS, Circuit Judges.

SEVERENS, Circuit Judge. This suit was commenced by a petition filed in the circuit court for Boyd county, Ky., by Daniel, a citizen of Kentucky, against the Yellow Poplar Lumber Company, an Illinois corporation, for the purpose of enforcing a contract lien upon certain lumber manufactured by the defendant from logs sold by Daniel to the Chicago Lumber Company, and to the defendant under contracts which gave to the seller a lien upon the logs and lumber for the purchase price. The lumber was seized under process from that court, and afterwards released upon a bond being given by the defendant, under the provisions of a statute of the state. The case was removed, upon the petition of the defendant, into the circuit court of the United States for the district of Kentucky. After the cause was removed, the defendant filed a demurrer and a plea to the petition, which were overruled. Pursuant to an order granting leave, the petition was converted into a bill, so as to conform to the rules of pleading of the courts of the United States in equity causes. In substance, it was alleged in the bill that the defendant had become the successor of the Chicago

Lumber Company, in respect to the rights and obligations of a certain contract between Daniel and the last-named company for the sale by Daniel, and the purchase by that company, of a quantity of logs to be delivered at several specified places on Rock Castle creek, a tributary of the Big Sandy river, which empties into the Ohio near Catlettsburg, Ky. This contract, as it is subsequently shown by the answer and proofs, was—

"For the sale and delivery to its predecessor by the plaintiff of certain timber in the main fork of Rock Castle creek, at the mouth of Lynn Bark Fork as one point, and Laurel Fork as another point, and the Rock House Fork, below Hamilton's dam, as a third point, of all the poplar timber bought by plaintiff, standing and to be cut for him, which by said contract was to be hauled and delivered by and for the plaintiff within the said tributaries of Rock Castle creek. All logs eighteen (18) and nineteen (19) inches in diameter to be eleven (11) cents per cubic foot. All logs twenty (20) inches and above at thirteen (13) cents per cubic foot. Said logs to be measured when in the creek, and in lengths twelve (12), fourteen (14), and sixteen (16) feet, or their multiples, as near as practicable so to do. All logs to be clear-butted, No. 1, merchantable timber. Wind-shakes and all visible defects to be made good. And to be cut so as to permit four (4) inches on logs ten (10), twelve (12), fourteen (14), and sixteen (16) feet long, and eight (8) inches on all the multiples thereof, in order to permit squaring and equalizing."

The bill then goes on to allege that after the making of the contract just referred to, and on the 28th of July, 1890, Daniel entered into a contract with one O'Connell, the vice president and general manager of the Chicago Lumber Company, whereby it was agreed that the profits which might accrue to Daniel from the former contract should be divided between Daniel and O'Connell, and that the latter acted for and in behalf of his company in making this contract; that on the 4th of December, 1891, the Yellow Poplar Lumber Company, having, in the meantime, succeeded to the rights of the Chicago Lumber Company, Daniel and the new company entered into this further contract:

"This agreement by and between the Yellow Poplar Lumber Company, doing business at Coal Grove, Lawrence county, Ohio, party of the first part, and John F. Daniel, of Catlettsburg, Ky., party of the second part, witnesseth: That the party of the second part, in consideration of the prices hereinafter named, has, by contract of sale and delivery heretofore made by the parties hereunto, bargained and sold to the parties of the first part, and agreed to deliver same in main fork of Rock Castle creek, at the mouth of the Lynn Bark Fork as one point, Laurel Fork as another point, and the Rock House Fork, below Hamilton's dam, as the third point, all the poplar timber that said Daniel has bought, standing, or contracted to be cut, hauled, and delivered in his name, within these tributaries of Rock Castle creek (to be branded with the word 'John' with a branding hammer, for identification at or before delivery thereof to the party of the first part herein). All logs 18 inches and 19 inches in diameter at 11 cents per cubic foot. All logs twenty (20) inches and up at thirteen (13) cents per cubic foot. Logs to be measured when in the creek. All logs to measure twelve (12), fourteen (14), and sixteen (16) feet in length, or their multiples, as near as it is practicable to do so. Logs to be clear-butted, and to be good, No. 1, merchantable timber. Wind-shakes and all visible defects to be made good. Logs are to be cut so as to permit four (4) inches in logs ten feet long, and twelve (12), fourteen (14), and sixteen (16) feet long, and eight (8) inches, or all multiples thereof; this to permit squaring and equalizing same. It is also understood and distinctly made a part of the agreement that all logs measured by party of the first part from said Daniel shall be branded with

the word 'John,' and that the party of the second part transfers to party of the first part the legal right of the brand 'John' on all poplar logs. The terms for above purchase are based on a cash transaction, and, whenever the party of the first part executes its note for accounts due on any measurement of said timber, then the party of the first part agrees that it will pay to the said Daniel the discount he is compelled to stand on cashing same. It is also agreed and understood between the parties hereto that the title to all the timber above mentioned and referred to shall remain in said Daniel until delivered and measured by party of the first part at points of delivery above designated. And it is further agreed that the said Daniel hath a lien for security of payment of all amounts owing him for same, and for payment of all notes given him by party of the first part as advancement of past-due payments on said timber, until said amount and notes are paid by said company. This agreement in nowise to affect performance of terms of contract of sale of said timber previously made by the parties herein.

"Witness our hands this 4th day of December, A. D. 1891.

"Yellow Poplar Lumber Company,
"F. J. O'Connell, V. P. & G. M.
"F. J. Daniel."

This contract was acknowledged, and on the 7th of the same month recorded in the office of the clerk of the county court; and under this contract Daniel delivered to the defendant company logs which, at the price stipulated, were of the value of $89,810.30; and that the defendant had sawed the logs into lumber. The bill further alleged that, besides these transactions, the plaintiff had performed services and paid out money to and for the defendant of the value and amount of $24,662.92; that he had sold to the defendant another lot of logs, on Johns creek, for the sum of $5,076; that by reason of the wrongful refusal to take certain other logs he had been damaged in the sum of $281.25; that in respect of all these other matters the defendant was indebted to him in the sum of $31,461.31; that the defendant had paid him, from time to time, in all, $94,629.82; that the plaintiff had applied sufficient of this last-named sum in payment of the $31,461.31, due on other than the main transaction, leaving a balance unpaid on the latter of $26,631.79, for which he claimed a lien. The prayer was for a judgment for that sum, and that the lien be enforced for its payment. The defendant filed a demurrer to the bill—First, for want of equity; second, for multifariousness; third, that as to all the matters extraneous to the lien contract, the plaintiff had a remedy at law; fourth, that it appeared from the bill that plaintiff had been paid for all logs for which there was a lien. The demurrer was overruled by the court, and rightly; for the allegations of the bill made out a prima facie case for relief, and were not open to the objections specified in the demurrer, or any of them. The defendant then filed an answer. The answer set out the contract of July 14, 1890, between the plaintiff and the Chicago Lumber Company, and admitted that there had been delivered under it logs which, at the contract price, were of the value of $94,480.07; that the plaintiff had been paid thereon, between January 29, 1890, and May 7, 1892, $83,508.29. The answer admitted the receipt of the Johns creek logs at $5,076, which, as we understand, is reckoned by the defendant in the $94,480.07, above mentioned as the contract price of all the logs; denies all liability for the $281.25 as damages for non-acceptance of logs; denies that the plaintiff had

any right to apply any part of the payments made to him upon other transactions than that for which the lien was claimed and avers:

"That during the whole time of the business transactions between complainant and defendant and its predecessor, as set out in complainant's bill of complaint, this defendant and its predecessor kept, and caused to be kept, a full and complete set of books, showing the entries of both debit and credit of all items between complainant and defendant; that complainant kept no account whatever thereof, and, as defendant avers. complainant, at stated intervals during said time, examined said books and said account between complainant and defendant, full and free access to which was given him by defendant and its predecessor, and all the matters of account between complainant and defendant were gone over and checked off by complainant and this defendant and its predecessor, and the correctness thereof, as shown on said books, admitted by defendant and its predecessor, and all said matters were thus reduced to an account stated as between complainant and defendant; that complainant, in order to avoid the necessity of keeping said books of account himself, paid the regular bookkeeper of this defendant and its predecessor a regular monthly stipend to keep, as complainant's employé, said account as between complainant and this defendant and its predecessor, which account was kept by him, and the complainant had knowledge of the contents of said account. And defendant therefore avers that complainant is estopped to deny the correctness of said account, as hereinbefore set out, and is concluded thereby, and said matters are pleaded as a bar to any right of recovery by the complainant upon any matters set out in this bill of complaint, or any relief in respect thereto."

The answer then sets out the before-mentioned agreement for the division of profits on the principal contract, as follows:

"Catlettsburg, Ky., July 28, 1890.

"J. F. Daniels, the party of the first part, hereby enters into a contract with the party of the second part, and takes the party of the second part as a partner in timber deal in Rock Castle creek, Martin county, Ky., which the party of the second part agrees and binds himself to furnish all the money and pay for all the trees or logs that have been bought or that may be bought by the party of the first part. Also agrees to pay for all the logs or trees at the place the party of the first part contracts to pay parties, wherever he has and may contract with, and the time and the place that the party of the first part agrees to pay the parties where he has bought or may buy of, and the party of the first part has got the buying and selling of contracted timber in Rock Castle creek and its tributaries in Martin county, Kentucky. And if the party of the second part wishes to turn this timber into cash at the following prices: 15c., 18″ to 23″, inclusive, per cube; 24″ and up, 17c. per cube,—which he will pay for when delivered and measured. This timber is not to be sold only by J. F. Daniel's consent, and Daniel has agreed to turn in all the contracts he has in said creek, except what he has sold to the Chicago Lumber Company. And, when timber is out and sold, profits and losses are to be deducted equally between parties of the first and second parts. Timber to be measured to the satisfaction of all parties.
"[Signed]                                    F. J. O'Connell.
"Witness: Lucy M. Moxley."

Thereupon the answer sets up what turns out to be the main ground of defense, which is, in substance, that O'Connell, the vice president and manager of the Chicago Lumber Company, as well as of the defendant company, had charge of their business in buying logs in that locality; that the contracts of July 14 and July 28, 1890, and of December 4, 1891, were made collusively and fraudulently between the plaintiff and O'Connell, for the purpose of selling the logs by the plaintiff for more than their value, so as to give a large profit, one-half of which was to go to O'Connell; that this scheme

was carried out in the execution of the contracts; that it was unknown to the defendant or its predecessor company, and could not by reasonable diligence have been discovered; and that "upon discovering the facts herein pleaded this defendant repudiated the said contracts and agreements, and refused then and yet refuses to be bound by the terms and conditions thereof, and so notified the plaintiff." The answer further states that the defendant does not know what was the sum of the profits realized from the transaction, but that "it is advised, and therefore avers to be true, that for the said sum of profits, or any profits in excess of said sum, appearing upon final hearing as having been made or accruing under or resulting from the said contracts and acts and things done under them, the plaintiff should account for and pay to defendant, and the defendant prays that it be so decreed."

A replication having been filed, the parties took proofs, and the case was brought on for hearing. The court deeming it expedient that a reference should be had for the aid of the court, referred the case to a special master, with directions that from the pleadings, exhibits, and evidence on file in the case he should report:

"First. To state the amount and kind of timber the plaintiff delivered to the defendant and its predecessor, Chicago Lumber Company, under the contracts for sale of timber from Rock Castle creek, filed in evidence, bearing date July 14, 1890, and December 4, 1891. Second. To state the amount and value under the contract covering sale and delivery of same to defendant, of timber from Johns creek, that the plaintiff, John F. Daniel, after November, 23, 1893, delivered or offered to deliver to the defendant, or that defendant refused to receive at place of delivery, and for which the defendant has not paid the plaintiff, and, in the event the defendant refused to so receive any of same, the damage, if any, the plaintiff sustained by reason thereof. Third. To find the amount, if anything, the defendant was indebted to the plaintiff for services rendered and labor performed and money paid out to or for the defendant, or for items charged to defendant in the accounts set up by plaintiff in his bill and amended bill. Fourth. To state what amounts the defendant paid the plaintiff on account of either or any of the items above mentioned, and what application, if any, was made of any of such payments on either of said accounts, and, if not made by the parties, what application thereof should be made. The commissioner will also state how and when the said payments were made, and whether by note or bill, check, cash, or otherwise, and state the whole amount in issue between the parties, and find the balance thereof, in whose favor it may be, and what date, and what interest, if any, should be allowed therewith. Fifth. To state whether or not there was any contract made by plaintiff for the division of the profits arising out of his sale of timber sued for, and, if any, what, when, and with whom and for what benefit made, and whether or not said agreement was collusive, and, if so, to what extent, if at all, the same affects the rights of complainant to maintain this action. He will specially find and report whether there was fraud or fraudulent collusion between the complainant and F. J. O'Connell in the execution of contracts of July 14 and 28, 1890, or in operations conducted thereunder, and the amount of profits upon said contracts, and upon contracts known as the 'Shelby,' and the J. F. Daniel & Co. or Johns creek contracts; how, when, and to whom paid; and to what extent, if at all, such affects the rights of the complainant to maintain this action."

The report of the special master states that on the hearing before him it was admitted by defendant's counsel that the "Rock Castle" logs delivered under the contract of July 14, 1890, at the prices therein specified, amounted in value to the sum of $89,789.30, and this was

agreed to by counsel for the plaintiff. The special master also states that it was agreed before him on the hearing that sufficient of the whole amount paid by the defendant to the plaintiff to cover the amount due to the plaintiff on account of other transactions than those for which the lien was given should be applied in satisfaction thereof. Practically, these concessions left for determination the ascertainment of the sum due on account of the other transactions, and the question in regard to the collusion and fraud on the part of the plaintiff and O'Connell, set up in the answer, and the consequences thereof, as affecting the rights of the parties, if it should be found that such fraud and collusion existed. The claims arising upon the subsequent transactions, called in the record and briefs the "Johns Creek Deal," were, during the hearing, withdrawn from the controversy, and need not be further noticed. The special master found that the total indebtedness of the defendant to the plaintiff, excluding the Johns creek transaction, was the sum of $93,441.81, and that it was entitled to be credited (excluding the Johns creek transaction) $85,012.64, showing a balance of $8,429.17; and the master expressed his view that this sum should bear interest from June 1, 1892. This balance includes a sum of $3,116.06, made up of "rebates," so-called, charged up against the plaintiff on the books of the defendant by direction of O'Connell, a matter which will be presently referred to.

So far we have the conclusions of the master. But with respect to the important question whether there was a fraudulent and collusive agreement between the plaintiff and O'Connell, which should affect the conclusions reached upon the accounting, he reported "pro forma" in favor of the plaintiff, excusing himself from his duty in that regard by stating his expectation that, whichever way he should find, that question would come before the court for determination upon exception by one or the other of the parties. Both parties filed numerous exceptions to the report. The case coming on for final hearing, the court directed the following decree:

"This cause, having come on to be heard on the 7th day of July, 1900, upon the exceptions of complainant and defendant to the report of L. N. Dembitz, special commissioner, filed herein on the 24th day of October, 1899, and upon pleadings and proof upon the whole case, and upon argument by counsel, and thereupon, upon consideration thereof, it is ordered, adjudged, and decreed by the court that the plaintiff, John F. Daniel, recover of the defendant, the Yellow Poplar Lumber Company, the sum of fifty-three hundred and thirteen dollars and eleven cents ($5,313.11), with interest from this date until paid at the rate of 6 per centum per annum; and it is also adjudged that the plaintiff recover of the defendant his costs herein incurred by him. The exceptions of both parties to the reports of the special commissioner are overruled, where inconsistent herewith."

It appears from this decree that the court confirmed the master's conclusions upon the matters of the accounting, except in respect of the "rebates," and disallowed interest, and further found, as is to be inferred from the decree, that the plaintiff was not guilty of the fraud of bribing O'Connell, as charged. How the exceptions of the parties were disposed of also appears only by inference from the decree. Both parties have appealed. The brief of counsel for the de-

fendant—now termed the "appellant"—deals solely with the principal defense, namely, that the plaintiff is barred from all relief upon the ground of his alleged fraudulent collusion with O'Connell in agreeing to share the profits of the sale and purchase of the logs. Counsel for the plaintiff—now cross-appellant—urge many errors in the master's accounting, and claim that the plaintiff was entitled to interest on the balance due him from June 1, 1892,—the date when, according to the contract, the balance should have been paid. With respect to the several exceptions to the accounting by the master, we have devoted much time and severely taxed our patience in the examination of the record, and while we should, perhaps, have reached different conclusions regarding some of the matters involved, yet, in view of the confused condition of the testimony, and the difficulty of reaching exact results, we do not think there is sufficient reason for disturbing his rulings in respect to any substantial facts. Those rulings are presumptively correct, and we are not convinced of error in any of them. We are satisfied that his balance is not far out of the way.

We will therefore attend to the main controversy presented by the defense. Neither the master nor the judge of the circuit court appear to have been convinced that there was a sufficient foundation in the facts for applying the undisputed rule in regard to the duty of an agent to his principal, and the obligation of a third person dealing with the agent to respect the rights of the principal, in such manner and to such extent as to bar the plaintiff of a remedy. We have examined the whole record with much care upon this subject, and have reached the following conclusions: We think that when the contract of July 14, 1890, was made, it was not contemplated by the plaintiff that there was to be any sharing of profits accruing thereon with O'Connell, and we are inclined to think that at that time O'Connell himself had not conceived the purpose of making such a stipulation. It would follow from this that the contract then made was valid. Within a short time,—a few days thereafter,—O'Connell, meeting other parties who were selling logs in the same locality, found that he could make a more favorable bargain with them, and it then occurred to him to force the plaintiff into an arrangement for dividing the profits of the contract with him, and to this end he told the plaintiff of the offers which had been made to him, and threatened to make new contracts with the other parties who were operating in the same locality with the plaintiff. The plaintiff, in order to save himself from the embarrassments of such competition, made the contract of July 28, 1890. The plaintiff claims and testifies that he supposed that O'Connell was making this last agreement in the interest of the company. There are some circumstances which favor his contention, but we think that at least he ought to have known that O'Connell was seeking to obtain this share of the profits for himself. The fact that such an arrangement had been made was known to many of the employés in the general office of the company at the place on the Ohio river to which the logs were driven, and it seems to have been a secret not much concealed. As early as November of the same year it was known to Isaacsen, a trusted agent of the com-

pany, whose integrity is attested by both the parties to the suit. O'Connell was one of the three stockholders in the company. The president, Green, and Mr. Frazier, the other stockholder, visited the office from the Chicago office during the execution of the contract, but were not there a great length of time. It seems as though ordinary attention to the affairs of the company on their part should have led to a knowledge of the contracts on which this large quantity of lumber was being delivered during a period of two years; and the fact that neither of them testifies to their want of knowledge is very significant. The answer for the defendant is not verified by them, but by Isaacsen, as "chief officer," who knew all about the facts very soon after the arrangement was made. There is evidence in the record which tends very strongly to prove that, after these transactions were ended, the defendant demanded and received from O'Connell his part of the profits on the contracts under which Daniel delivered the logs in question.

The contention of the defendant, the Yellow Poplar Lumber Company, is that O'Connell and Daniel were, when the contract of July 14, 1890, was made, acting with a mutual understanding that O'Connell should share the profits, and the assumption of the truth of this charge is necessary to support the line of defense adopted; for, if that contract was made without the fraudulent purpose charged, it was valid, and the later stipulation of July 28th was collateral to it. If Daniel had a contract which would yield him profits, he might do what he would with them, except that he could not lawfully use them to bribe the defendant's agent to do any act prejudicial to the defendant, or to omit to do what his duty to his principal required. If any injurious consequences result to the principal from such unlawful collusion with the agent, the other party should be required to atone for the wrong by making good the injury done. But the proof in this case fails to show that any injury resulted to the company from the subsequent agreement. In fact, no attempt seems to have been made to establish any such ground of defense, and no data for reckoning damages thereon are presented. In the answer the only injury of which the defendant complains as the result of the sharing of profits with O'Connell is that the company was made to pay an excessive price for the logs; but, as we find that the stipulation for sharing profits was not made until after the contract of sale, it could not have induced the latter. Moreover, we are by no means satisfied that the purchase price, having regard to the time the contract had to run, and the risk of a probable rise in value, was excessive, when compared with current market prices. There is some discrepancy in the testimony, but several witnesses, apparently credible, put the value at about the prices stipulated for in the contract.

The argument of the learned counsel for defendant is founded upon the assumption that, by reason of the illegality in the alleged fraudulent collusion between the plaintiff and O'Connell, the contract was or became void, and, further, that the plaintiff would be precluded in a court of equity from any relief; but, upon the facts assumed by the defendant, the contract was not void, but voidable only at the election of the defendant, seasonably exercised. In transactions be-

tween private parties a contract affected by fraud of this kind stands upon the same ground as one brought about by any other species of fraudulent practice; that is, the principal may confirm it, and his ratification relates back to the making of the contract, and the fraud is condoned. Or he may repudiate it, if he does so promptly upon discovery of the fraud. If he partakes knowingly of the benefit of the fraudulent stipulation, that is a ratification of it.

There are many convincing reasons for thinking that the stipulation for division of profits between Daniel and O'Connell was known to the company, and that it was content to seize the part of the profits assigned to O'Connell. If the case turned upon this point, we should be prepared to hold that the conduct of the company had precluded it from now taking the position that the contract was void by reason of fraudulent collusion in the contract of July 14, 1890; but, as we have already said, we do not believe that any fraudulent purpose existed at that time. We have no disposition to belittle the wholesome principles by which the duties of an agent and third parties dealing with him are regulated. At the same time, it is the duty of the court to see that, in applying them, they are not carried to the extent of working positive injustice, and defeating the purposes for which they exist. There are many features of this case which convince us that the plaintiff did not stand on an equal footing with the other party, but that, on the other, he was oppressed and coerced by O'Connell, and that the plaintiff did not agree to share the profits with O'Connell with the intention of inducing him to depart from his duty to the company, but submitted to it as an exaction.

The disposition of the question relating to the rebates, amounting to $3,116.06, made by O'Connell, remains. There seems to have been no reason for this. They were arbitrarily made by O'Connell's direction in the accounts of the company for purposes of his own, and not on account of any shortage or defects in the logs, and we are not satisfied that the plaintiff ever consented thereto. It does not seem just that the plaintiff should suffer this loss, and the company take the gain from the wrongful act of its agent. We think this sum should not have been deducted from the price of the logs.

We see no reason for the denial of interest from the time when the logs were delivered and the price should have been paid, which appears to have been about June 1, 1892. The Kentucky statute in reference to interest (Carroll's Ky. St. c. 72), would seem to require that interest should have been allowed from that date.

The decree must be modified by adding the sum deducted for rebates, $3,116.06, and awarding interest upon the principal sum thus found due from June 1, 1892.